IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| **THE COBB FOUNDATION, INC.,**<br><br>*Plaintiff,*<br><br>v.<br><br>**HART COUNTY, GEORGIA,**<br><br>*Defendant.* | **CIVIL ACTION NO.<br>3:24-cv-00053-TES** |

**ORDER GRANTING PLAINTIFF'S
MOTION TO REMAND**

On May 20, 2024, Plaintiff The Cobb Foundation, Inc. ("CFI"), filed this action in the Superior Court of Hart County, Georgia, seeking declaratory relief regarding "the sponsorship and funding obligations of a government pension plan." [Doc. 1-1, p. 1]. Based on 28 U.S.C. §§ 1331, 1441, and 1446, Defendant Hart County, Georgia ("County"), removed the action to this Court. [Doc. 1]. After removal, the County filed a Motion to Dismiss [Doc. 3]. Along with its Response [Doc. 9] to the County's Motion to Dismiss, CFI also filed a Motion to Remand [Doc. 8].

**BACKGROUND**[1]

This case involves the relationship between Hart County and CFI—a Georgia-

---

[1] These facts are drawn from the operative Complaint [Doc. 1-1].

based non-profit that leased a hospital and related facilities from the County starting in 1995. *See generally* [Doc. 1]. But for context, we begin in 1974, when the Hart County Hospital ("Hospital") adopted the County's retirement income plan (later known as the Group Pension Plan for Employees of the Hart County Hospital ("Plan")). [Doc. 1, ¶ 12].

Under the terms of the Plan, only the "employer" had the power to amend or terminate the Plan. [*Id.* at ¶ 13]. Because the Hart County Hospital Authority ("Authority") owned and operated the Hospital, the Authority was the "employer" for purposes of the Plan's terms. [*Id.*]. Then, in 1995, CFI and the County entered into a lease agreement. [*Id.* at ¶ 16]. Since the Authority no longer owned the facility, its employees were terminated, meaning they were no longer government employees. [*Id.* at ¶ 17]. But CFI offered employment to certain Hospital employees. [*Id.*]. This change in employment also altered the employees' ability to participate in the Plan—CFI was not a sponsor, employer, or subsidiary under the Plan, so any employees hired by CFI were no longer eligible for future benefit accruals. [*Id.* at ¶ 18].

In 1996, the Authority voted to freeze the Plan, meaning that while the Plan remained in place and employees could receive benefits accrued through the termination of their employment, no new benefits would accrue, and no new employees could be added to the Plan. [*Id.* at ¶ 19]. Following the freeze, CFI's only responsibility was to administer the Plan "with respect to those accrued benefits." [*Id.* at ¶ 21]. The

2

Authority remained the sponsor and retained the ability to amend or terminate the plan. [*Id.* at ¶ 22].

After several years of operating under the lease agreement, CFI and the County agreed to terminate the lease by signing a "Lease Termination Agreement." [*Id.* at ¶ 23]. The termination agreement did not mention the status of the Plan, but under the termination agreement, the Authority agreed to "transfer and [convey] to CFI all of its rights, titles, interests, equities, claims and demands in and any assets owned by CFI which are utilized by CFI in the operations of the Hospital." [*Id.* at ¶ 25]. Additionally, under the termination agreement, CFI agreed to pay the Authority approximately $1.35 million. [*Id.* at ¶ 27]. Following this termination, the County decided to dissolve the Authority in August 2014. [*Id.* at ¶ 28]. The County did not, though, address the Plan as it dissolved the Authority. [*Id.* at ¶ 31]. It also didn't fund the Plan. [*Id.* at ¶ 32].

Since the County didn't fund the Plan, CFI—acting as the administrator of the Plan—informed the County that the Plan would soon become insolvent without future funding. [*Id.* at ¶ 35]. The County didn't take action. [*Id.* at ¶ 36]. Instead, the County asserted that the obligation to fund the Plan lies with CFI. [*Id.* at ¶ 37]. In response, CFI notified the County that it was terminating its administrative services related to the Plan. [*Id.* at ¶ 39]. CFI asserts the Plan would "become insolvent on or about June 1, 2024." [*Id.* at ¶ 40].

CFI seeks declaratory judgment against the County pursuant to O.C.G.A. § 9-4-2, holding that "(1) CFI is not and has never been the plan sponsor for the Plan, (2) CFI does not have and has never had responsibilities or obligations to fund the Plan, (3) the County is the sponsor for the Plan, and (4) the County holds the responsibilities and obligations of and for funding the Plan." [*Id.* at ¶ 50]. The County moves to dismiss the Complaint because it contends CFI's claim is preempted by the Employee Retirement Income Security Act ("ERISA"). [Doc. 3, p 1]. On the other hand, CFI moves to remand this case to the Superior Court of Hart County for the exact opposite reason—CFI argues that the plan is exempt from ERISA.

## **LEGAL STANDARD**

"Federal pre-emption is ordinarily a federal defense to the plaintiff's suit." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987). And, generally, as a defense, "it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court." *Id.* In ERISA, Congress created a narrow exception to this general rule. Indeed, Congress assigned the duty of handling ERISA-related matters solely to federal district courts. 29 U.S.C. § 1132(f). As the Supreme Court reasoned, "Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court." *Metro. Life Ins. Co.*, 481 U.S. at 66. But to invoke federal jurisdiction based on ERISA's preemption, the issue must be one which "Congress has so fully legislated an area of law such that a

plaintiff's state law claims filed in state court are necessarily federal in character and removable based on federal question jurisdiction." *Ervast v. Flexible Prod. Co.*, 346 F.3d 1007, 1012 (11th Cir. 2003) (internal quotations omitted). "The issue of complete preemption is jurisdictional; meaning, if the claims are not completely preempted, they are not properly removed and must be remanded to state court." *Id.* In the end, the Court must decide if CFI's claims are completely preempted by ERISA. If so, the County properly removed the case. If not, the case must be remanded.

## **DISCUSSION**

Congress intended ERISA's preemption to be broad and sweeping—the text makes that clear:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III shall supersede *any and all* State laws insofar as they may now or hereafter *relate* to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis added). That's about as plain as it gets. But, ERISA's exceptions to coverage are just as plain. *See* 29 U.S.C. § 1003(b). Those exceptions include "governmental plan[s]," as defined by § 1002(32), which is a plan "established or maintained for its employees by the Government of the United States, or by the government of any State or political subdivision thereof, or by an agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). If a plan meets that definition, then by ERISA's plain text, it's not covered. 29 U.S.C. § 1003(b)(1) ("The

provisions of this subchapter shall not apply to any employee benefit plan if . . . (1) such a plan is a governmental plan[.]").

The question before the Court, then, becomes two-fold: First, is the Authority (which adopted the Plan for its employees) a political subdivision or instrumentality of the state? And second, was the Plan "established *or* maintained" by the Authority?

### I.   Political Subdivision/Instrumentality

As to the first question, ERISA doesn't help the Court determine what exactly counts as a "political subdivision" or "instrumentality" because the statute never defines those terms. And, as best the Court can tell, the Eleventh Circuit hasn't answered the question, either. Out of an abundance of caution, then, the Court looks to two sources of law. First, the Court analyzes the question under the Supreme Court's "political subdivision" test in *National Labor Relations Board v. Natural Gas Utility District of Hawkins County, Tennessee*, 402 U.S. 600 (1971) ("*NLRB*"). Second, the Court evaluates the matter under Georgia law—the law under which the Authority was created.

#### A. *NLRB* Test

"Because ERISA is a federal statute, the term 'political subdivision' must be interpreted by reference to federal law, in the absence of clear legislative intent to the contrary." *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 915 (2d Cir. 1987). To determine the meaning under federal law, the Second, Third, Fifth, and Seventh Circuits use the test outlined by the Supreme Court in *NLRB*. *See id.*; *Koval v. Washington*

*Cnty. Redevelopment Auth.*, 574 F.3d 238, 242-43 (3d Cir. 2009); *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016); *Shannon v. Shannon*, 965 F.2d 542, 547 (7th Cir. 1992). In *NLRB*, the Supreme Court held that a political subdivision of a state, for the purposes of labor statutes, is an entity that is either "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB*, 402 U.S. at 604-05.

Here, the Hart County Hospital Authority established the plan in 1974. [Doc. 1-1, ¶ 12]. Therefore, the question is whether the Hart County Hospital Authority falls under the definition of a government entity for purposes of ERISA. Georgia law is clear that it does.

First, hospital authorities are creatures of Georgia statutory law. The "Hospital Authorities Law,"[2] O.C.G.A. § 31-7-70 *et seq.*, sets out the procedure for establishing a hospital authority in each county or municipality in Georgia. Specifically, O.C.G.A. § 31-7-72 states that: "[t]here is created in and for each county and municipal corporation of the state a public body corporate and politic to be known as the 'hospital authority' of such county or city."

And courts analyzing Georgia law—including for ERISA purposes—have "consistently found hospital authorities to be 'instrumentalities' of the state." *Williams-*

---

[2] The Georgia Legislature passed the "Hospital Authorities Law" in 1964. *See* Ga. Pub. L. 1964, p. 499.

7

*Mason v. Reliance Standard Life Ins. Co.*, No. CIV.A. CV 206-124, 2006 WL 1687760, at *4 (S.D. Ga. June 16, 2006) (citing *Crosby v. Hosp. Auth. of Valdosta and Lowndes Cnty.*, 93 F.3d 1515, 1525 (11th Cir. 1996)); *see also Howard v. Liberty Mem'l Hosp.*, 752 F. Supp. 1074, 1076 (S.D. Ga. 1990) ("[A] hospital authority enjoys state sovereign immunity, unless the state waives the immunity, because it is a 'public body corporate and politic.'").

Second, a hospital authority's board is made up of individuals who are "responsible to public officials or to the general electorate." *NLRB*, 402 U.S. at 604-05. Indeed, O.C.G.A. § 31-7-72 requires that the members of a hospital authority board be appointed by the "governing body of the county or municipal corporation." Even more, Georgia caselaw implies that hospital authority board members themselves are public officials. *See Crozer v. Reichert*, 561 S.E.2d 120, 122 (Ga. 2002) ("Beginning with *Bradford v. Justices of Inferior Court,* 33 Ga. 332 (1862), this Court recognized that, 'where an individual has been appointed or elected, in a manner prescribed by law, has a designation or title given him by law, and exercises functions concerning the public . . . he must be regarded as a public officer.'"); *United States v. Wingo*, 723 F. Supp. 798, 803 (N.D. Ga. 1989) ("The short answer is that he was a member of the Board of Trustees of the Hospital Authority and to the extent that it is a public entity, he is a public official by virtue of his position.").

Taken together, the Court is satisfied that the Authority is a governmental entity for purposes of the *NLRB* test.

### B. Georgia Law

Without replowing too much of the same ground, Georgia law also considers hospital authorities to be government instrumentalities. *See Richmond Cnty. Hosp. Auth. v. Richmond Cnty.*, 336 S.E.2d 562, 563 (Ga. 1985) ("The Richmond County Hospital Authority (the Authority) **is a governmental entity** which was created in 1960 by resolution of the Board of Commissioners of Richmond County, pursuant to the Hospital Authorities Act (OCGA § 31–7–70 *et seq.*; Ga. L. 1964, p. 499), to operate the University Hospital as a public facility in Richmond County.") (emphasis added); *Dep't of Hum. Res. v. Ne. Georgia Primary Care, Inc.*, 491 S.E.2d 201, 203 (Ga. Ct. App. 1997) ("A hospital authority is a government instrumentality because it is created by local governmental units for the purpose of exercising, among other things, public and essential governmental functions, to wit: furnishing medical care and hospitalization for the indigent."); *Hall v. Tift Cnty. Hosp. Auth.*, No. 7:12-CV-12 HL, 2013 WL 2484089, at *1 (M.D. Ga. June 10, 2013) ("Defendant Tift County Hospital Authority is a governmental entity created under state statute.").

Therefore, under both the *NLRB* test and Georgia law, the Authority is a governmental entity for purposes of ERISA's text.

## II. Established or Maintained the Plan

The second question becomes a bit thornier. Obviously, when the Plan began, consistent with the above discussion, it was "established" by a political subdivision of the state. But, after the lease agreement, did the Plan remain a government plan under ERISA's exception? That's the million-dollar question.

This isn't the first time that such a situation has happened. For example, in *Hightower v. Texas Hospital Association*, 65 F.3d 443 (5th Cir. 1995), a nearly identical fact pattern ensued. There, the suit centered around the Anderson County Hospital Retirement Plan, established by Anderson County, Texas. *Id.* at 446. The plan at issue in that case remained under Anderson County's control until 1988, when the county leased the hospital to a private foundation. *Id.* As of the date of the lease, all employees ceased their government employment and became employees of the foundation. *Id.* The foundation did not take control or actively participate in the retirement plan's administration—those duties remained with a plan administrator. *Id.* A class of plaintiffs filed suit claiming entitlement to the plan's surplus. *Id.* The parties agreed that when the plan began, it was excepted from ERISA as a government plan. The real question then became whether the plan remained a government plan after the lease agreement. *Id.*

After discussing the purposes behind ERISA's enactment, the Fifth Circuit held that "once a governmental entity relinquishes responsibility for providing a retirement

10

plan to a private entity, that private entity operates or maintains the existing pension plan, or any newly created pension plan, subject to the provisions of ERISA." *Id.* at 448. But that conclusion was buttressed almost exclusively by the language of the parties' lease agreement. *Id.* ("In this case, we need only look to the lease agreement to determine whether the Plan remained exempt under Title IV.").

CFI argues that *Hightower* is inapposite—or possibly even supports remand—for two reasons. First, *Hightower* relied on Title IV of ERISA (concerning the termination of an ERISA plan), whereas this case involves Title I (regarding the operation of plans still in place). [Doc. 9, pp. 6-7]. Second, CFI argues that *Hightower* resolved the claims at the summary-judgment stage, which allowed for the resolution of certain facts.[3] The Court agrees.[4]

As to CFI's first point, Title I and Title IV of ERISA define the government exemption differently. Under Title I, a government plan is one that is "established *or* maintained" by a government entity. 29 U.S.C. § 1002(32). For Title IV, government plans must be "established *and* maintained" by a government body. 29 U.S.C. §

---

[3] The Court need not reach this argument regarding *Hightower* because the first argument controls.

[4] To be clear, the County acknowledges "the exact holding of *Hightower* may be inapplicable here with regard to Title IV[.]" [Doc. 12, p. 10].

11

1321(b)(2). Importantly, the *Hightower* court concluded that Title IV applied to the plan in that case, and the § 1321(b)(2) conjunctive test applied. *Hightower*, 65 F.3d at 450.[5]

When faced with a question of statutory interpretation, the Court begins with the obvious: the text of the statute. *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002). "We do this because we presume that Congress said what it meant and meant what it said." *Id.* (citations omitted). And, in this case, the plain text is clear. To be considered a governmental plan for purposes of ERISA's exemption, a plan need only be established *or* maintained by a government instrumentality. 29 U.S.C. § 1002(32). That ends the analysis. *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *Bishop v. Reno*, 210 F.3d 1295, 1298 (11th Cir. 2000).

The County pushes against this result, arguing that following the statute's plain text—that is, reading the disjunctive "or"—would "defeat [ERISA's] purpose," so the Court should look beyond the literal language. [Doc. 12, p. 11]. But courts facing those

---

[5] Title I applies to all general "employee benefit plans." 29 U.S.C. § 1003(a). Title IV applies to "plan termination insurance," *i.e.*, when an employer decides to wind down a plan. 29 U.S.C. § 1321. *See also Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 6 (2004) (instructing that "ERISA comprises four titles . . . Title I requires administrators of all covered pension plans to file periodic reports with the Secretary of Labor, mandates minimum participation, vesting and funding schedules, establishes standards of fiduciary conduct for plan administrators, and provides for civil and criminal enforcement of the Act[,]" while Title IV "created the Pension Benefit Guaranty Corporation (PBGC) and a termination insurance program to protect employees against the loss of 'nonforfeitable' benefits upon termination of pension plans that lack sufficient funds to pay such benefits in full.") (internal citations omitted).

same arguments have rejected them quickly. *Rose*, 828 F.2d at 920; *Gualandi v. Adams*, 385 F.3d 236, 243 (2d Cir. 2004); *Roy v. Tchrs. Ins. & Annuity Ass'n*, 878 F.2d 47, 50 (2d Cir. 1989); *Feinstein v. Lewis*, 477 F. Supp. 1256, 1260 (S.D.N.Y. 1979); *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1354 (10th Cir. 2009); *Simac v. Health All. Med. Plans, Inc.*, 961 F. Supp. 216, 220 (C.D. Ill. 1997). As the Ninth Circuit reasoned, "Congress may well have intended, contrary to the express language of the Act, to keep this kind of plan within ERISA's grasp. Nevertheless, in light of the above analysis and what Congress actually said in ERISA, we conclude that the plan in question was a governmental plan and thus exempt." *Silvera v. Mut. Life Ins. Co. of N.Y.*, 884 F.2d 423, 427 (9th Cir. 1989). In the end, Congress made a choice to distinguish the two definitions of governmental plans under the two titles—it is not this Court's prerogative to override that decision. *Hill v. Texaco, Inc.*, 825 F.2d 333, 334 (11th Cir. 1987) ("It is not our place to contradict Congress' policy choices."); *United States v. Fifty-Two Firearms*, 362 F. Supp. 2d 1308, 1315 (M.D. Fla.) ("It is not the role of the judiciary to change the plain meaning of a statute, or to re-balance public policy already weighed by Congress.").

The County also argues that because the Plan includes language indicating the Authority's intent to follow ERISA in implementing and maintaining the Plan, it should be understood to be an ERISA plan. [Doc. 12, pp. 8-9]. But the Authority's intent doesn't matter—ERISA's text does. *Saunders v. Davis*, No. 15-CV-2026 (RC), 2016 WL 4921418, at

\*10 (D.D.C. Sept. 15, 2016) ("The language in the Trust's founding documents does not determine whether the Trust is subject to ERISA. The ERISA statute, not the parties' intentions, controls the outcome of this case."); *Hall v. Me. Mun. Emps. Health Tr.*, 93 F. Supp. 2d 73, 75 (D. Me. 2000) ("It is clear that MMEHT desires to be an ERISA plan. To that end, MMEHT has complied with ERISA's various reporting requirements since 1982. However, desire and compliance do not an ERISA plan make. A benefit plan does not choose whether to opt in or opt out of ERISA.").[6]

In sum, it is undisputed that the Authority established the Plan. [Doc. 3, p. 2]. That is enough to designate it as a governmental plan, which means the Plan is exempt from ERISA.

## **CONCLUSION**

Because the Plan is a governmental plan that is exempt from ERISA's coverage, this Court lacks jurisdiction to hear this case. *Stern v. Int'l Bus. Machs. Corp.*, 326 F.3d 1367, 1374 (11th Cir. 2003) ("Because the IBM Program is exempted by regulation from ERISA, the doctrine of complete preemption is inapplicable and no federal question jurisdiction exists, and removal to federal court was improper.") (internal citations omitted); *Kemp v. Int'l Bus. Machines Corp.*, 109 F.3d 708, 714 (11th Cir. 1997); *Fromm v. Principal Health Care of Iowa, Inc.*, 244 F.3d 652, 654 (8th Cir. 2001) ("Because Fromm's

---

[6] To be sure, Congress allowed churches—whose plans would otherwise be exempt from ERISA—to opt into ERISA's mandates. 29 U.S.C. § 1003(b)(2) *in connection with* 26 U.S.C. § 410(d). Congress did not include the same option for government plans.

health benefits plan is exempt from ERISA, the district court properly concluded that it lacked subject matter jurisdiction."); *Mo. State Colls. & Univs. Grp. Ins. Consortium, Inc. v. Bus. Men's Assur. Co. of Am.*, 980 F. Supp. 1333, 1335 (W.D. Mo. 1997).

Accordingly, the Court **GRANTS** CFI's Motion to Remand [Doc. 8] and **DENIES** the County's Motion to Dismiss [Doc. 3][7] and Motion to Stay [Doc. 11].[8] This matter is **REMANDED** to the Superior Court of Hart County, Georgia.

**SO ORDERED**, this 14th day of August, 2024.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[7] The County filed a Motion to Dismiss, arguing that Plaintiff's state-law declaratory judgment claim (the only claim presented in Plaintiff's Complaint) is "preempted by [ERISA]," since it "depends on the existence of an ERISA plan, or otherwise concerns the creation and administration of an ERISA plan." [Doc. 3, p. 1 (citing 29 U.S.C. § 1144(a))]. But, as the Court explained above, the Plan is not subject to ERISA. That means Plaintiff's state-law declaratory judgment claim is not preempted by ERISA. *Nichols v. Se. Health Plan of Alabama, Inc.*, 859 F. Supp. 553, 559 (S.D. Ala. 1993) ("Since there is no ERISA plan, ERISA does not preempt plaintiff's state law claims."); *Raskin v. CyNet, Inc.*, 131 F. Supp. 2d 906, 910 (S.D. Tex. 2001). Because the Court lacks subject-matter jurisdiction over this case, however, the Court need not dive deep into the County's Motion. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999).

[8] The County asks the Court to stay the case pending its request for a Department of Labor advisory opinion on the application of the governmental plan exemption to this case. [Doc. 11, p. 5]. The Court does not find a stay necessary. First, the County does not offer a timeline for when the Department might issue its advisory opinion. Second, even if the Department issued its opinion, it would have little-to-no impact on the Court's analysis. *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1238 (11th Cir. 2002). To be sure, the statute is not ambiguous, therefore the Court does not afford deference to the Department's advisory opinions or interpretations. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2254 (2024); *Gilbert v. Alta Health & Life Ins. Co.*, 276 F.3d 1292, 1303 (11th Cir. 2001); *Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1293 (11th Cir. 2021).